# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
March 10, 2015 Session

## STEVEN A. HOLDSWORTH v. WENDY ALFORD HOLDSWORTH

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-000718-11      James F. Russell, Judge**

---

**No. W2013-01948-COA-R3-CV – Filed June 3, 2015**

---

This is an appeal from an extremely contentious divorce. The parties married in 1994 and had one child together during the marriage. Husband filed for divorce in 2011. In July 2013, the trial court entered a final decree of divorce. Among other things, the trial court found that Husband dissipated marital assets by writing checks to his girlfriend totaling $15,633 and ordered Husband to reimburse Wife that amount. The trial court also entered a permanent parenting plan that designated Wife the primary residential parent and provided a residential parenting schedule. As part of its permanent parenting plan and based on its calculation of the parties' respective incomes, the trial court set Husband's child support obligation and ordered Husband to pay Wife $34,109 in retroactive child support. Finally, the trial court awarded Wife $4,000 per month as alimony *in futuro* and $461,586 as alimony *in solido* to reimburse Wife for her attorney's fees and expenses. Husband filed a notice of appeal challenging the trial court's rulings.

Prior to Husband's appeal of the July 2013 order being heard, however, Husband and his girlfriend were arrested when a sheriff's deputy discovered a marijuana plant growing in their garage. Shortly thereafter, Wife filed a petition seeking to modify the permanent parenting plan to impose certain restrictions on Husband's parenting time. Among other things, Wife sought to condition Husband's parenting time on his girlfriend's submission to and passing of random drug tests. In March 2014, the trial court ruled that a material change of circumstance occurred following the entry of the July 2013 order and entered a modified permanent parenting plan that incorporated Wife's proposed restrictions. Husband filed a separate appeal from that order, and the two cases were consolidated for appeal to this Court.

Having thoroughly reviewed issues raised by the parties and the record on appeal, we conclude that while the trial court did not err in finding that Husband dissipated marital assets by writing checks to his girlfriend, Wife is not entitled an award equal to the full amount of the dissipation. We modify the amount of the dissipation award to $7,816.53 to reflect Husband's one-half interest in the dissipated amounts. We affirm the

trial court's allocation of parenting time. While we also affirm the trial court's decisions to award Wife child support and retroactive child support, we conclude that the trial court based the amount of those awards on a determination of the parties' respective incomes that is not supported by a preponderance of the evidence. Accordingly, we vacate the trial court's ruling as to the amount of those awards and remand this matter for further proceedings consistent with this opinion. Next, we reverse the trial court's award of alimony *in futuro*. Given the facts of this case, we conclude that Wife is a candidate for transitional alimony and direct the trial court on remand to determine the appropriate amount and duration of such an award. While we affirm the trial court's decision to modify the permanent parenting plan, we conclude that because Husband's girlfriend was not a party to the proceedings, the trial court erred in setting conditions on Husband's parenting time based on her compliance with provisions of the permanent parenting plan. Finally, we conclude that the trial court did not apply a proper legal standard in awarding Wife her attorney's fees and expenses and reached an illogical result. We reverse the trial court's award of attorney's fees. We decline to award attorney's fees associated with this appeal to either party.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in part, Affirmed in part as Modified, Vacated in part, Reversed in part, and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN, J., and KENNY ARMSTRONG, J., joined.

Amy J. Farrar, Murfreesboro, Tennessee, and Lanier Fogg, Memphis, Tennessee, for the appellant, Steven A. Holdsworth.

George Lawrence Rice, III and Mary Louise Wagner, Memphis, Tennessee, for the appellee, Wendy Alford Holdsworth.

**OPINION**

**I. BACKGROUND AND PROCEDURAL HISTORY**

Steven Holdsworth ("Husband") and Wendy Alford Holdsworth ("Wife") met when they were both students at the University of Texas-Arlington. The parties married in Texas in July 1994. After the marriage, they remained in Texas and continued to pursue their education. In 1995, Wife earned a Master's Degree of Science in Social Work from the University of Texas-Arlington. In 1999, Husband earned a Master of Business Administration degree in Financial and Estate Planning from the University of Dallas. Shortly thereafter, the parties moved to Memphis to be closer to Wife's parents.

2

After moving to Memphis, Wife got a job as a social worker with Shelby County Schools, and Husband began working as a financial planner for Legacy Wealth Management ("LWM"), where he remained employed through the time of trial.

In April 2005, Wife resigned from her position with Shelby County Schools to stay home and provide care for her mother, who had been experiencing serious health issues. In January 2007, Wife gave birth to the parties' only child. For the remainder of the marriage, Wife stayed at home to care for the parties' daughter. In the meantime, Husband was extremely successful in his career at LWM. By 2008, Husband rose to the position of Managing Director and was receiving a yearly compensation that allowed the family to live comfortably. They took several trips to Hawaii and, in 2009, purchased a five-bedroom home in Cordova for $415,000.

In 2008, Husband met Elizabeth McFadden[1] ("Ms. McFadden") while both were serving on the board of directors of a local trade association. Over time, the relationship between the two transitioned from professional to personal, and in November 2009, Husband began having an affair with Ms. McFadden. At the time, Ms. McFadden was married and had two children of her own.

As Husband's relationship with Ms. McFadden became more serious, it had a significant impact on both his personal and professional life. In January 2011, Husband told Wife he wanted a divorce. On February 16, 2011, Husband filed a petition for divorce on the ground of irreconcilable differences. Around the same time, Ms. McFadden applied for a position at LWM and was hired by the company. Although Husband served on the three-person committee that interviewed Ms. McFadden and ultimately made the hiring decision, he opted not to disclose the extent of his personal relationship with Ms. McFadden prior to her hire. Despite Husband's efforts to conceal the romantic nature of the relationship, it did not take long for his coworkers at LWM to learn that he was having an affair with Ms. McFadden. In March 2011, the company forced Husband to resign from its board of directors and take a sixty-day leave of absence. Additionally, according to the testimony of Husband and Wife at trial, the company reduced Husband's annual base salary from $125,000 to $100,000.

Despite Husband's failure at concealing the affair from LWM, he still attempted to conceal it from Wife by telling her that his leave of absence was voluntary and taken in response to the recent death of his father. Not surprisingly, Wife found out about the affair shortly thereafter and filed an answer and counter-complaint for divorce on May 6, 2011. As the divorce proceedings commenced, the parties attempted to move on with their lives. In June 2011, Wife moved out of the parties' marital residence into a home

---

[1] Husband's paramour is referred to throughout the record using several different names. We refer to her throughout this opinion as Ms. McFadden, as that is the name the parties use in their briefs.

she rented from her parents. In October 2011, the parties sold the marital residence at a significant loss, and Husband moved into an apartment. Husband was forced to draw down a significant portion of his 401(k) to cover a $59,879 deficit on the sale of the home. In an attempt to cut down on his living expenses, Husband moved in with Ms. McFadden in a rented home in August 2012. In the meantime, the divorce proceedings grew exceedingly contentious.

## *Divorce Proceedings*

After the parties filed over 300 pleadings and made more than thirty court appearances for hearings on various petitions and motions, the case was finally set for trial beginning April 29, 2013. Prior to trial, each party submitted proposed permanent parenting plans ("PPP") and sworn affidavits of their respective incomes and expenses pursuant to Local Rule 14(C).[2]

Wife's proposed PPP set forth a parenting schedule, providing that the child would spend 288 days with Wife and 77 days with Husband. The plan also provided that until such time as Husband and Ms. McFadden were lawfully married, Husband would not be allowed to introduce the child to Ms. McFadden or exercise overnight visitation with the child. Wife listed Husband's monthly imputed income as $15,050[3] and sought $1,421

---

[2]In pertinent part, Rule Fourteen of the Circuit Court for the Thirtieth Judicial District (Shelby County) states:

**(C) Sworn Statement Pertaining to Child Custody, Child Support or Alimony.**

(1) In all contested divorces, suits for separate maintenance, or for legal separation, each party must file with the clerk, no later than ninety (90) days before trial, a sworn statement setting forth the party's income, a list of expenses, and a description and valuation (or estimate) of real and/or personal property possessed in any form, the state of its title, and the party's claimed interest in such property. The sworn statement must also include, if known, or if the information is reasonably procurable, the income and property interest of the opposing party, both real and personal, and the valuation thereof. Any changes in the statement while the case is pending must be disclosed as soon as possible, and not later than ten (10) days before the trial.

(2) The sworn statement must also set forth separately the amount deducted from salary for social security and income tax. Self-employed persons must estimate these sums, using governmental guidelines or other reliable sources that are available.

(3) In all custody proceedings, the sworn statements required by T.C.A. § 36-4-106(b)(1) must also be contained within the pleadings or in an affidavit attached to the pleading.

[3]Wife added Husband's $125,000 base salary prior to his demotion in March 2011 to the average of his annual bonuses from 2010 to 2012: ($125,000 + $55,609.03 = $180,609.03 annually or $15,050.75 per month).

from him in monthly child support. Using similar estimations of Husband's monthly income, Wife sought $34,109.25 in retroactive child support that accrued during the pendency of the divorce proceedings. In her Rule 14 affidavit, Wife listed her monthly income from her private practice as a licensed clinical social worker as $437. Wife listed $8,631 in monthly expenses, which she claimed resulted in a $6,773 monthly shortfall. The expenses included rent, utilities and home maintenance expenses, food and clothing, and child-care expenses. Some of the expenses listed related to her business, such as $1,500 in office rent and staffing. Wife also listed $1,788 in monthly payments on promissory notes executed in favor of her parents for attorney's fees and living expenses. To offset the deficit in her monthly budget, Wife sought an award of alimony *in futuro* from Husband payable as $4,000 per month for sixty months, then $7,000 per month for sixty months, then $8,000 per month for 300 months. Wife also submitted that she should receive alimony *in solido* for her share of the parties' primary marital asset: Husband's LWM stock, which she valued at $839,261. Wife specified that the award of alimony *in solido* should be payable over approximately twenty-four years, with three percent interest, beginning at $15,000 per year and increasing by $2,000 each year until fully paid. Finally, Wife sought an award of alimony *in solido* to repay her attorney's fees and living expenses incurred in connection with the divorce. Wife attached the affidavit of her attorney listing her attorney's fees and expenses in the amount of $346,683.96.

Perhaps not surprisingly, Husband's filings presented a drastically different picture of the parties' respective incomes and expenses. Husband's proposed PPP also designated Wife the primary residential parent, but set forth a parenting schedule that provided that the child would spend 255 days with Wife and 140 days with Husband.[4] Husband's proposed PPP did not contain any restrictions on his parenting time related to Ms. McFadden. Husband's plan sought to impute monthly income of $3,500 to Wife and provided that he would pay her $973 in monthly child support. In his Rule 14 affidavit, Husband listed his gross monthly income from LWM as $8,343.[5] Husband stated that his net monthly pay, after tax and benefit deductions, was $5,733. Husband listed $7,823 in monthly expenses, which he claimed resulted in a $2,090 monthly shortfall. Like Wife, Husband listed expenses for rent, utilities, home maintenance, etc. Husband also listed $1,438 in expenses related to the parties' child, including child support and $3,008 in monthly payments for litigation expenses, credit card debt, and personal loans. Husband agreed that the LWM stock should be classified as marital property and divided equally

---

[4] As noted by the trial court, the parenting schedule in Husband's proposed PPP provides for 395 days of total parenting time per year.

[5] Husband calculated his monthly income using a $100,000 base salary without adding any amount for bonuses.

5

but stated that the value of the stock was $468,599. Husband's filings did not propose any specific method of splitting the remainder of the parties' marital property.

A bench trial was conducted over the course of eleven days, beginning on April 29, 2013 and concluding with closing arguments on May 15, 2013. The parties stipulated the existence of grounds for divorce, and evidence was presented on other issues, such as spousal support, child support, the PPP, distribution of marital assets and debt, and attorney's fees. The trial court also heard a great deal of testimony regarding the appropriate valuation of the parties' primary marital asset: the 5,030 shares of LWM stock. In addition to hearing testimony from Husband and Wife, the court heard the testimony of Robert Vance, an expert in forensic accounting, and Jim Isaacs, the President and CEO of LWM. The court also reviewed the deposition testimony of the child's psychologist, Dr. Elizabeth Harris. On May 15, 2013, Wife's attorney submitted an affidavit of attorney's fees stating that through that date, Wife had been charged $384,652.50 in attorney's fees and $36,420.82 in expenses. Wife argued that based on her limited income, she did not have the ability to pay her own attorney's fees and expenses and requested that the trial court order Husband to pay the full $421,073.32 amount as alimony *in solido*.

### July 25, 2013 Order

After reviewing the testimony and exhibits presented at trial, the trial court announced its findings and conclusions orally on May 29, 2013. On July 25, 2013, the trial court entered its Final Decree of Divorce along with a separate written memorandum of Findings of Fact and Conclusions of Law. Pursuant to the parties' stipulation that Husband's inappropriate marital conduct constituted grounds for divorce, the trial court declared the parties divorced. With respect to the division of property, the trial court found that the parties' compliance with Local Rule 14 was "marginal at best" and made its task of dividing the marital assets nearly impossible. Nevertheless, the court attempted to make such an equitable distribution. The court awarded each party the cars, furniture, and other personal property currently in their possession. The trial court found that the parties possessed "modest sums" of money held in various checking and savings accounts and ordered that each party retain the funds of separate bank accounts and split funds in any joint accounts. The trial court found that the parties' other marital assets included approximately $57,735 in Husband's LWM 401(k) account and $43,319 held in a joint escrow account by the parties' attorneys. The court awarded Husband the $43,319 held in escrow but ordered that it be used to satisfy the parties' two substantial marital debts: $29,584 in credit card debt and $24,597 owed to the IRS for taxes due but not paid in 2011. The court also awarded Husband the full amount of his 401(k) but ordered that it also be used to satisfy the marital debts if they were not paid off within a year. Because the parties sold the marital home during the course of the litigation, the parties did not

have mortgage debt at the time of the hearing.

The parties' primary marital asset at the time of the hearing was Husband's 5,030.03 shares of LWM stock. Notably, the stock was issued by LWM subject to tight restrictions on its transfer and liquidation. At the time of the trial, the stock could not be liquidated without penalty of a substantial discount. Throughout the proceedings, each party vigorously disputed the other's valuation of the stock. Wife argued that the stock should be valued at $839,261, an amount based on its 2012 year-end book value as set forth in an independent audit. Conversely, Husband argued that the stock should be valued at $468,599, an amount the trial court determined to be based on its value after the penalty and after taxes. The trial court accepted Wife's valuation of the stock and concluded that she should be awarded fifty percent of that amount, or $419,631. Due to the restrictions on the transfer of the stock, the trial court ordered that Husband pay that amount, with three percent interest annually, as alimony *in solido* over a period of years with payments beginning at $15,000 per year and increasing by $2,000 per year until fully paid. Finally, the court found that Husband dissipated marital assets by writing checks to Ms. McFadden for $15,633.06 and ordered that Husband reimburse Wife that amount.

Next, the court turned its attention to parenting issues. After reviewing the proposed PPPs submitted by each party, the court noted the parties agreed that Wife should be named the child's primary residential parent. The parties' primary dispute with regard to parenting was whether the court should impose restrictions on the presence of Ms. McFadden around the child. Husband's proposed PPP did not impose any restrictions or limitations with regard to Ms. McFadden. Wife's proposed PPP provided that until Father lawfully married Ms. McFadden, Father would not be permitted to exercise any overnight parenting time with the child and would not be permitted to leave the child in Ms. McFadden's care for any length of time. The trial court adopted Wife's proposed PPP. In doing so, it expressed concern regarding Ms. McFadden's behavior and her parenting of her own children. Additionally, the court found that Husband prioritized his relationship with Ms. McFadden over his relationship with the child. Citing those concerns, the court found that Wife's proposed PPP would serve the child's best interests and adopted her plan without any modification. As such, the court also adopted Wife's calculations of the parties' respective monthly incomes for purposes of computing Husband's child support obligation and ordered Husband to make child support payments to Wife of $1,421 per month. Additionally, the trial court ordered Husband to pay retroactive child support of $34,109.25 for arrearages from the date of the parties' separation through the date of the trial.

Next, the trial court addressed the issue of spousal support. Given the large income disparity of the parties, the trial court determined that Wife was the

"disadvantaged spouse" as that term is used in the relevant statutes. To determine whether spousal support was warranted and, if so, the nature, amount, and duration of the support, the trial court considered Wife's need and Husband's ability to pay. Based on Wife's pre-trial filings, the court found that Wife demonstrated a need for long-term support of $4,000 per month. In considering Husband's ability to pay that support, the trial court examined Husband's pre-trial filings and rejected several of the litigation-related expenses and loans he had listed as expenses. After doing so, the court calculated Father's "real" expenses to be $4,179 per month. The trial court found that even if it accepted Husband's calculation of his net monthly income and subtracted Husband's "real" expenses, Husband would be able to meet his child support obligations, make his monthly support payments, and still have money left over each month. Consequently, the court ordered Husband to pay Wife $4,000 per month as alimony *in futuro* until her death or remarriage. To secure that obligation, the trial court also ordered Husband to secure and maintain a life insurance policy in the sum of $1,500,000 with Wife designated as the primary beneficiary until her death or remarriage.

Finally, the court addressed Wife's contention that Husband should be responsible for her attorney's fees and other litigation expenses. In doing so, the trial court stated that the litigation was "entirely of the Husband's making." The trial court found that Husband filed the original complaint for divorce, leaving Wife with no choice but to defend herself. Moreover, the trial court found that many of the expenses incurred by Wife in the lawsuit were the result of Husband's attempts to throw up "smoke screen after smoke screen" and "roadblock after roadblock" in the discovery process. The trial court ordered that Husband pay $421,073.32 to Wife as alimony *in solido* for her attorney's fees and expenses incurred through May 14, 2013. Additionally, the trial court ordered that Wife's attorney file an additional supplemental affidavit to include additional attorney's fees and expenses incurred after that date through the entry of the final decree of divorce. Wife's attorney subsequently filed an affidavit reflecting additional attorney's fees and expenses in the amount of $40,513.50, and the court ordered Husband to also pay that amount as alimony *in solido*.[6]

In sum, as set forth in its July 25, 2013 Final Decree of Divorce, the trial court awarded Wife the following judgments against Husband: (1) $419,631, reflecting the value of Wife's interest in LWM stock; (2) $15,633.06, reflecting the amount of Husband's dissipation of marital assets; (3) $34,109.25, reflecting the amount of retroactive child support Husband owed; (4) $421,073.32 for attorney's fees and

---

[6]The trial court requested evidence of fees and expenses incurred by Wife after May 14, 2013 during its oral ruling on May 29, 2013. On July 19, 2013, Wife's attorney submitted a supplemental affidavit of attorney's fees reflecting fees and expenses incurred by Wife from May 15 through July 18, 2013 of $40,513.50. Accordingly, both totals were included in the trial court's Final Decree of Divorce entered on July 25, 2013.

expenses incurred through May 14, 2013; and (5) 40,513.50 for attorney's fees and expenses incurred from May 15 through July 18, 2013. The listed amounts reflected a total judgment against Husband in the amount of $930,960.13. The trial court also ordered Husband to make payments to Wife of $1,421 per month in child support and $4,000 per month in alimony *in futuro*. To secure satisfaction of the judgments, the trial court imposed a lien on all LWM stock and all real and personal property owned or thereafter acquired by Husband. Father timely filed a Notice of Appeal from the trial court's July 25, 2013 ruling. Prior to Husband's appeal being heard by this Court, however, events transpired that necessitated further proceedings in the trial court.

### *Modification Proceedings and March 13, 2014 Order*

On November 14, 2013, a Sheriff's deputy went to the residence shared by Husband and Ms. McFadden to execute on a levy filed by Wife. While searching the premises for property to levy, the deputy discovered drug paraphernalia and a marijuana plant in the parties' detached garage. Husband and Ms. McFadden were both arrested and charged with unlawful possession of a controlled substance with intent to sell.

On December 19, 2013, Wife filed a petition to modify the PPP order in light of the criminal charges pending against Husband and Ms. McFadden. In her petition, Wife sought to temporarily modify the PPP to suspend Husband's parenting time or, alternatively, to limit Husband's parenting time to two hours per day on days he is scheduled to have parenting time and require that his parenting time be supervised by Wife, Wife's mother, or another person charged with such supervision. Additionally, Wife sought to add provisions prohibiting the child from being taken to the home Husband shared with Ms. McFadden, prohibiting the child from being in Ms. McFadden's presence, prohibiting Husband from taking the child out of school, and requiring Husband, at his expense, to submit to random urine and hair follicle drug screens.

Prior to the trial court's hearing on the petition, the charges against Husband were dismissed, and Ms. McFadden entered a plea that placed her in a Diversion Program until January 2015. The trial court held a hearing on Wife's petition over the course of two days on January 31 and February 14, 2014. The trial court heard testimony from each party as well as from a Shelby County Sheriff's Deputy called to investigate the marijuana plant found in Husband's garage. At the outset of the proceedings, Wife's attorney submitted a proposed ruling that provided for modification of the PPP to add the following residential schedule and restrictions:

1. For the period of January 31, 2014 through January 20, 2015, the following conditions shall apply:

a.     Father shall exercise unsupervised parenting time on the following dates and times: 5:00 p.m. to 8:00 p.m. on Fridays, 9:00 a.m. to 7:00 p.m. on Saturdays, and 9:00 a.m. to 5:00 p.m. on Sundays, every other weekend, beginning January 31, 2014.

b.     Father may exercise additional, unsupervised parenting time from 5:30 p.m. to 7:00 p.m. on Tuesdays.

c.     For those holidays that Father was permitted to exercise parenting time pursuant to the parties' Permanent Parenting Plan, entered July 25, 2013, Father may exercise unsupervised parenting time from 9:00 a.m. to 5:00 p.m.

d.     Father shall continue to pick the child up from and return the child to Mother's residence.

e.     Father shall not exercise any parenting time at the residence he shares with Ms. Elizabeth McFadden.

f.     Father shall not permit Ms. McFadden to have any contact with [child] and shall not exercise any parenting time in the presence of or near Ms. McFadden.

g.     This residential schedule shall be conditioned upon Father and Ms. McFadden agreeing to submit to three (3) urine and hair follicle drug screenings at Mid-South Drug Testing, to be randomly requested by Mother, at any time in Mother's discretion, and to be completed within five (5) hours of such request. Father shall pay for the screenings. If Father or Ms. McFadden either refuse to submit to a drug screening pursuant to the terms described in this paragraph or fail a screening, Father shall be limited to only supervised parenting time as described in Section B, including subsections one (1) through three (3), of the Fiat of Mother's Petition to Modify Permanent Parenting Plan Order, filed December 19, 2014.

2.     If Ms. McFadden fulfills the requirements of her diversion program, which is scheduled to be completed on January 20, 2015, Father shall resume exercising parenting time consistent with the parties' Permanent Parenting Plan, entered July 25, 2013, with the following conditions:

a. Father must supervise [child] for the entire duration of his parenting time and shall not permit [child] to be in the care of Ms. McFadden unsupervised for any length of time.

b. This residential schedule shall be conditioned upon Father and Ms. McFadden agreeing to three (3) drug screenings per year, as set out in paragraph (1)(g) until January 20, 2017.

Wife testified that she was worried for her child's safety and viewed the restrictions in her proposed modified PPP as necessary to ensure that Ms. McFadden could demonstrate responsibility and appropriate behavior before being allowed around the child. During his testimony, Husband stated that the marijuana plant belonged to Ms. McFadden. Husband testified that Ms. McFadden obtained the plant to limit the severity of migraines she experienced over the course of the summer in 2013. Husband insisted he had not helped Ms. McFadden in growing or nurturing the plant and denied that he smoked marijuana. Husband testified that Ms. McFadden had never smoked marijuana around the child and insisted that the presence of the marijuana plant did not pose any threat to the safety of the child. Nevertheless, at the close of the hearing on February 14, 2014, the trial court announced its finding that a material change of circumstance had occurred and that the child's best interests would be served by modifying the PPP to include the residential plan and restrictions set forth in Wife's proposed ruling. On March 13, 2014, the trial court entered a written order memorializing its ruling and incorporating a transcript of its prior oral ruling. In a separate order, the trial court also awarded Wife $9,528 for attorney's fees and expenses incurred in connection with her petition to modify. Husband timely filed a second Notice of Appeal from the trial court's March 13, 2014 ruling. This Court subsequently ordered that the two appeals be consolidated.

## II. ANALYSIS

Husband presents a number of issues for our review on appeal. We will address each of Husband's arguments in turn. Though Husband does not challenge the trial court's distribution of the parties' marital assets and debts, he contends that the trial court erred in concluding that he dissipated marital assets. Husband argues that the trial court erred in adopting Wife's proposed PPP, in modifying the PPP, in calculating Husband's child support obligation, and in awarding retroactive child support. Husband contends that the trial court erred in awarding alimony *in futuro* to Wife and in setting an amount of alimony *in futuro* that exceeds Wife's need and his ability to pay. Finally, Husband asserts that the trial court should not have ordered him to pay Wife's attorney's fees and litigation expenses.

Wife argues that the trial court's ruling should be affirmed. Though Wife does not seek any additional award of alimony *in futuro*, as further support for the trial court's decision she asserts that the trial court erred in excluding certain expenses in its calculation of her monthly need and in miscalculating the amount of Husband's net monthly income. Wife also seeks attorney's fees and expenses for this appeal.

On appeal, we review the trial court's findings of fact *de novo* on the record with the presumption that those findings are correct, "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). Additionally, because the trial court has the opportunity to observe the witnesses' demeanor and hear the in-court testimony, we afford considerable deference to the trial court's credibility determinations and the weight given to oral testimony. *Andrews v. Andrews*, 344 S.W.3d 321, 339 (Tenn. Ct. App. 2010). We review the trial court's conclusions of law *de novo* with no presumption of correctness. *Hyneman v. Hyneman*, 152 S.W.3d 549, 553 (Tenn. Ct. App. 2003).

## A. Dissipation

We begin by addressing Husband's argument that the trial court erred in concluding that he dissipated marital assets by writing checks totaling $15,633.06 to Ms. McFadden. In its Findings of Fact and Conclusions of Law, the trial court stated:

> 90. There has been an issue raised in this case regarding dissipation by Mr. Holdsworth of marital assets or portions of the marital estate in terms of his relationship with Elizabeth McFadden. Found among the exhibits in the cause is Trial Exhibit No. 32 which is a Rule 1006 summary reflecting the sum of fifteen thousand six hundred thirty-three dollars and six cents ($15,633.06) in checks actually written by Mr. Holdsworth to Elizabeth McFadden.

> 91. Again, considering the entire body of proof as a whole, the Court finds a dissipation of marital assets in that amount and will award judgment in favor of the Wife against the Husband. The record is not clear, but there appears to be other dissipation -- for example, money spent for gifts of jewelry and the like to Ms. McFadden -- but there is no empirical evidence in this record of a specific amount for which the Court may enter judgment without speculation.

Husband acknowledges that he wrote the checks to Ms. McFadden but contends that the trial court erred in failing to consider the purpose of the checks. Husband contends that the majority of the checks are for living expenses he and Ms. McFadden shared after

12

moving in together in August 2012.

A party's dissipation of marital or separate property is one of many factors a trial court may take into consideration in making an equitable division of a marital estate. Tenn. Code Ann. § 36-4-121(c)(5). While there is no statutory definition of dissipation, the term typically refers to the use of marital property for a purpose unrelated to the marriage, often to "hide, deplete, or divert" marital property after a marriage is irretrievably broken. *Larsen-Ball v. Ball*, 301 S.W.3d 228, 235 (Tenn. Ct. App. 2010). The concept of dissipation is based on waste. *Altman v. Altman*, 181 S.W.3d 676, 681 (Tenn. Ct. App. 2005). In determining whether dissipation has occurred, the court must distinguish between dissipation and discretionary spending. *Larsen-Ball*, 301 S.W.3d at 235. While discretionary spending may be ill-advised, it is typical of the parties' expenditures throughout the course of the marriage. *Id.* Expenditures that constitute dissipation, on the other hand, are so far removed from normal expenditures that they can be characterized as wasteful or self-serving. *See Watson v. Watson*, 309 S.W.3d 483, 490 (Tenn. Ct. App. 2009). In *Watson*, this Court discussed the appropriate analysis for allegations of dissipation:

> In determining whether dissipation occurred, we find trial courts should consider the following: (1) whether the evidence presented at trial supports the alleged purpose of the various expenditures, and if so, (2) whether the alleged purpose equates to dissipation under the circumstances. The first prong is an objective test. To satisfy this test, the dissipating spouse can bring forward evidence, such as receipts, vouchers, claims, or other similar evidence that independently support the purpose as alleged. The second prong requires the court to make an equitable determination based upon a number of factors. Those factors include: (1) the typicality of the expenditure to this marriage; (2) the benefactor of the expenditure, namely, whether it primarily benefitted the marriage or primarily benefitted the sole dissipating spouse; (3) the proximity of the expenditure to the breakdown of the marital relationship; (4) the amount of the expenditure.

*Id.* at 490-91 (quoting *Ward v. Ward*, No. W2001-01078-COA-R3-CV, 2002 WL 31845229, at *3 (Tenn. Ct. App. Dec. 19, 2012)). The party alleging dissipation has the initial burden of production and the burden of persuasion at trial. *Larsen-Ball*, 301 S.W.3d at 235. Once the party alleging dissipation establishes that the money has been dissipated, the burden shifts to the party who spent the money to produce evidence to show that the expenditures were appropriate. *Watson*, 309 S.W.3d at 491.

During the hearing, Wife introduced evidence in the form of a Rule 1006

summary[7] that between September 1, 2011 and March 14, 2013, Husband wrote forty-one checks to Ms. McFadden totaling $15,633.06. Husband did not object to the evidence. By introducing evidence of the checks, several of which are for amounts exceeding one thousand dollars, written by Husband to his paramour, Wife satisfied her initial burden of production and shifted the burden to Husband to produce evidence that the expenditures were appropriate. *See Larsen-Ball*, 301 S.W.3d at 236 (stating that the money husband spent on his paramours "clearly constitutes dissipation"). Husband contends that he met that burden, but relies on little more than his own testimony in doing so. Specifically, Husband asserts that his undisputed testimony demonstrates that the checks to Ms. McFadden were for living expenses. Given the trial court's findings on Husband's credibility, this argument carries little weight. Moreover, we note that of the ten checks for which Husband gave an explanation on direct examination, four were intended to reimburse Ms. McFadden for rental of a condo for their July 2012 South Carolina vacation. In his brief, Husband also states that the memo line of each check contains a notation of its purpose. There are 156 checks attached to the Rule 1006 summary submitted at trial. We decline to sift through each check in an effort to discern which notations appear to indicate an expenditure for living expenses when Husband has apparently declined to do so himself. Moreover, we note that while Husband states that each check contains a notation of its purpose, he does not argue that the stated purposes are not indicative of dissipation. In light of the foregoing, we are not able to conclude that the evidence preponderates against the trial court's finding that Husband's expenditures constituted dissipation.

Notwithstanding our conclusion that the evidence supports the trial court's finding that the checks Husband wrote to Ms. McFadden constituted dissipation, we note that the trial court ordered Husband to reimburse Wife for the full amount of the checks. The trial court's award ignores the fact that Husband also had an interest in the money. *See Odom v. Odom*, No. E2007-02250-COA-R3-CV, 2008 WL 4415429, at *8, (Tenn. Ct. App. Sept. 30, 2008) (noting that each of the divorcing parties was entitled to one-half of the dissipated assets). Here, because the trial court divided the parties' marital assets equally, we conclude that Husband is entitled to one-half of the assets he dissipated. Therefore, we modify the amount of the trial court's dissipation award to $7,816.53 to reflect Husband's one-half interest in the dissipated assets.

## B. Permanent Parenting Plan

This case presents an unusual mix of issues related to the PPP. The trial court

---

[7]"The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary or calculation. The originals or duplicates shall be made available for examination or copying, or both, by other parties at reasonable times and places. The court may order that they be produced in court." Tenn. R. Evid. 1006.

14

adopted Wife's proposed PPP on July 25, 2013 as part of its Final Decree of Divorce. Later, however, Husband and Ms. McFadden were discovered to have a marijuana plant growing in their garage and were both arrested and charged with unlawful possession of a controlled substance with intent to sell. Wife filed a petition to modify the PPP to impose certain restrictions on Husband's parenting time. After a hearing, the trial court modified the PPP to incorporate the restrictions. Husband challenges both the original PPP and the modified PPP. Because the modified PPP is essentially the same as the original PPP with additional limitations on Husband's parenting time, it is necessary for us to address Husband's challenges with regard to both. To begin, we address the arguments Husband raises related to the trial court's entry of the original PPP.

### *Original Permanent Parenting Plan*

Prior to trial, each party submitted a proposed PPP. In its Final Decree of Divorce, the trial court adopted Wife's proposed PPP without modification. Though the plans submitted by each party provide for Wife to be designated as child's primary residential parent, Husband takes issue with the trial court's allocation of residential parenting time.

The residential parenting schedule in Wife's proposed PPP provided for Wife to have 288 days of parenting time with the child per year and for Husband to have 77 days. The parenting schedule in Husband's proposed PPP provided for Wife to have 255 days of residential parenting time with the child per year and for Husband to have 140 days. As the trial court noted, Husband's proposed allocation of residential parenting time calls for a 395-day calendar year. Though Husband's proposed PPP sets forth day-to-day and holiday/school vacation schedules, given the many variables it contemplates, it is impossible to determine exactly where the extra thirty days of parenting time should be subtracted. In any event, the trial court found that after considering the testimony and evidence presented by the parties, "the plan proposed by Mother is in the manifest best interest of the child under all of the facts and circumstances in this case." Husband argues that the evidence presented "strongly preponderates" against the trial court's parenting time determination.

Creating a workable parenting plan is one of the most important responsibilities courts have. *Armbrister v. Armbrister*, 414 S.W.3d 685, 696 (Tenn. 2013). The Tennessee Supreme Court recently explained the standard applicable to this Court's review of a residential parenting schedule in *Armbrister*:

> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, *Holloway v. Bradley*, 190 Tenn. 565, 230 S.W.2d 1003, 1006 (1950); *Brumit v. Brumit*, 948 S.W.2d 739, 740 (Tenn.Ct.App.1997), trial judges, who have the

15

opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Massey–Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn.Ct.App.2007). Thus, determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge." *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn.1988) (quoting *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn.Ct.App.1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn.2001). A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Id.* "An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn.2011). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge*, 42 S.W.3d at 88.

*Armbrister*, 414 S.W.3d at 693.

Husband contends that the trial court adopted Wife's proposed PPP based on its moral disapproval of his actions and its desire to punish him for his affair with Ms. McFadden. Husband argues that the trial court's underlying motivation for adopting Wife's plan is evidenced by its failure to conduct a comparative fitness analysis or consider the statutory factors enumerated in Tennessee Code Annotated section 36-6-404(b).[8] Husband further contends that an examination of the trial court's written statement of findings and conclusions demonstrates that the court failed to consider many important facts before adopting Wife's proposed PPP. Husband insists that after proper reexamination of the facts, this Court should articulate a modified PPP that provides Husband with more participation in the child's life.

In crafting a residential schedule, section 36-6-404(b) of the Tennessee Code

---

[8]In his brief, Husband cites the fifteen factors set forth in Section 36-6-106(a) applicable to trial courts in designating the primary residential parent. At the time of the hearing in this case, trial courts setting residential schedules were guided by a different, albeit similar set of sixteen factors listed in Section 36-6-404(b)(1)-(16). Tenn. Code Ann. § 36-6-404(b) (2010). By Ch. 617 Pub. Acts of 2014, Section 36-6-404(b) was amended by replacing the list of sixteen factors with language directing the court to consider the fifteen factors at Section 36-6-106(a) when determining the residential schedule. Because there is little substantive difference between the factors in the two statutes, we proceed with our analysis as though Husband had cited the factors in Section 36-6-404(b).

directs the trial judge to consider fifteen enumerated factors, as well as any other factors it deems relevant, to determine how much time the child should spend with each parent. Although the statute does not require the trial court to list each applicable factor along with its conclusion as to how that particular factor impacted the court's overall determination, the statute clearly requires the court to at least consider all applicable factors. *In re Connor S.L.*, No. W2012-00587-COA-R3-JV, 2012 WL 5462839, at *7 (Tenn. Ct. App. Nov. 8, 2012) (internal citations omitted).

Here, the trial court did not reference each of the section 36-6-404(b) factors specifically. With regard to the fifteen enumerated factors, the trial court stated in its Findings of Fact and Conclusions of Law:

> The Court has carefully studied points one (1) through fifteen (15) in that code section, and they need not be repeated and articulated here. Considering each one of those points, the Court has articulated previously facts which address virtually all of them, and as to all of those points the Mother comes out ahead in virtually each and every point.

In considering other relevant factors, the court was particularly bothered by Husband's decision to vacation with Ms. McFadden rather than his daughter in July 2012. Husband and Ms. McFadden had planned and funded the trip in advance in anticipation that it would be their honeymoon. Though Husband and Ms. McFadden were not married when the time for the trip arrived, as the trial court had not yet entered a final decree of divorce in this case, they took the trip as planned. In its findings, the trial court criticized Husband's decision to take the trip with Ms. McFadden rather than use it as an opportunity to bond with his daughter. In part, the trial court stated that, "[Husband] chose to follow his own selfish desires by doing the 'honeymoon' with Elizabeth McFadden. That speaks volumes to this Court with regard to where Father's priorities rest when it comes to his daughter." Husband contends that the trial court's statements in reference to his trip with Ms. McFadden reveal that it failed to consider important facts with regard to the statutory factors.

After reviewing the evidence, we are unconvinced by Husband's argument. From the time the child was born in 2007 until her return to the workforce in April 2012, Wife stayed at home to care for the child. Even since her return to the workforce, Wife has continued to be heavily involved in the child's life on a daily basis. Wife testified that the flexibility in her work schedule allows her to have a great deal of participation in the child's life. Wife testified that she is able to take days off to go on all of the child's school field trips. Conversely, Husband testified that at the time of the hearing he had been forced to ask Wife to deviate from the parties' temporary parenting plan on multiple occasions due to work-related conflicts.

17

Moreover, we note that Husband does not specify any particular modifications to the trial court's allocation of parenting time that he would like this Court to make. In the absence of such a specification, it is reasonable to assume that Husband seeks the entry of a PPP that more closely resembles the one he submitted prior to trial. We note, however, that a comparison of the proposed residential schedules submitted to the trial court by each party reveals that their specific allocations of parenting time are very much alike. Both schedules provide that Husband will exercise parenting time every other weekend. The schedules divide holidays and other school-free days similarly. Both plans provide for Husband to exercise two full weeks of parenting time in the summer (though Wife's plan sets specific dates for summer visitation and Husband's plan does not). The two schedules also provide essentially the same allocation of parenting time during the child's winter vacation. Wife's schedule actually provides more parenting time for Husband during the child's fall and spring vacations than Husband's schedule. There are only two differences in Husband's proposed plan that result in him having more parenting time than Husband receives under Wife's schedule: (1) Husband's schedule provides that his parenting time every other weekend will begin on Friday at 5:30 p.m. and end when he drops the child off at school on the following school day, while Wife's schedule provides that Husband's parenting time every other weekend will begin on Friday at 5:00 p.m. and end on Sunday at 5:00 p.m.; and (2) Husband's schedule provides that he will have overnight parenting time every other Thursday night, while Wife's schedule provides that Husband may have additional parenting time each Tuesday from 5:30pm to 7:00pm. At the hearing, Wife expressed concern with the Thursday night visitation in Husband's proposed schedule because the child often has tests on Friday, and she was not sure Husband would consistently get her to school on time. Having considered the evidence presented, we are unable to conclude that the trial court abused its discretion in adopting the proposed PPP submitted by Wife rather than the one submitted by Husband. Therefore, we affirm the trial court's allocation of parenting time between the parties.

*Modification of the Permanent Parenting Plan*

On December 19, 2013, Wife filed a petition to modify the PPP to add certain restrictions on Husband's parenting time after Husband and Ms. McFadden were both arrested and charged with unlawful possession of a controlled substance with intent to sell. Prior to the trial court's hearing on the petition, the charges against Husband were dismissed, and Ms. McFadden entered a plea that placed her in a Diversion Program until January 2015. The trial court conducted a hearing on the petition over the course of two days on January 31 and February 14, 2014. On March 13, 2014, the trial court entered an order granting Wife's petition to modify the PPP. The court attached a copy of the modified PPP, which included the following provisions:

The following special provisions apply:

1. For the period of January 31, 2014 through January 20, 2015, the following conditions shall apply:

a. Father shall exercise unsupervised parenting time on the following dates and times: 5:00 p.m. to 8:00 pm. on Fridays, 9:00 a.m. to 7:00 p.m. on Saturdays, and 9:00 a.m. to 5:00 p.m. on Sundays, every other weekend, beginning January 31, 2014.

b. Father may exercise additional, unsupervised parenting time from 5:30 p.m. to 7:00 p.m. on Tuesdays.

c. For those holidays that Father was permitted to exercise parenting time pursuant to the parties' Permanent Parenting Plan, entered July 25, 2013, Father may exercise unsupervised parenting time from 9:00 a.m. to 5:00 p.m.

d. Father shall continue to pick the child up from and return the child to Mother's residence.

e. Father shall not exercise any parenting time at the residence he shares with Ms. Elizabeth McFadden.

f. Father shall not permit Ms. McFadden to have any contact with [child] and shall not exercise any parenting time in the presence of or near Ms. McFadden.

g. This residential schedule shall be conditioned upon Father and Ms. McFadden agreeing to submit to three (3) urine and hair follicle drug screenings at Mid-South Drug Testing, to be randomly requested by Mother, at any time in Mother's discretion, and to be completed within five (5) hours of such request. Father shall pay for the screenings. If Father or Ms. McFadden either refuse to submit to a drug screening pursuant to the terms described in this paragraph or fail a screening, Father shall be limited to only supervised parenting time as described in Section B, including subsections one (1) through three (3), of the Fiat of Mother's Petition to Modify Permanent Parenting Plan Order, filed December 19, 2014.

2. If Ms. McFadden fulfills the requirements of her diversion program,

which is scheduled to be completed on January 20, 2015, Father shall resume exercising parenting time consistent with the parties' Permanent Parenting Plan, entered July 25, 2013, with the following conditions:

a.    Father must supervise [child] for the entire duration of his parenting time and shall not permit [child] to be in the care of Ms. McFadden unsupervised for any length of time.

b.    This residential schedule shall be conditioned upon Father and Ms. McFadden agreeing to three (3) drug screenings per year, as set out in paragraph (1)(g) until January 20, 2017.

Husband raises two issues with regard to the trial court's modification of the PPP. First, Husband contends that the trial court erred in modifying the PPP to add the additional restrictions because there was no material change in circumstances following the entry of the original PPP. Second, Husband contends that even if Wife did establish a material change in circumstances, the trial court erred in conditioning his parenting time on Ms. McFadden's compliance with the court's order because she is a non-party.

Once a PPP has been incorporated into a final decree of divorce, the parties are required to comply with it unless and until it is modified by the court. *Armbrister*, 414 S.W.3d at 697. In deciding whether to modify a PPP, the court must first determine whether a material change in circumstances has occurred and then determine whether the modification would be in the child's best interest. Tenn. Code Ann. § 36-6-101(a)(2)(B)-(C). If no material change of circumstances has been proven, the trial court is not required to make a best interests determination and must deny the petition to modify. *Cf. Pippin v. Pippin*, 277 S.W.3d 398, 405 (Tenn. Ct. App. 2008) (dealing with a petition for modification of custody).

Tennessee Code Annotated section 36-6-101(a)(2)(C) addresses the material change in circumstances standard applicable to this case. That section provides:

If the issue before the court is a modification of the court's prior decree pertaining to a residential parenting schedule, then the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes

20

relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.

As this Court has recognized, the statute sets "a very low threshold for establishing a material change of circumstances" when a party is seeking to modify a residential parenting schedule (as opposed to modifying custody). *Boyer v. Heimermann*, 238 S.W.3d 249, 257 (Tenn. Ct. App. 2007). Even if the changed conditions reasonably could have been anticipated when the initial residential parenting schedule was adopted, the court may find a material change of circumstances so long as the party seeking modification has demonstrated a material change in circumstances affecting the child's best interest. *Armbrister*, 414 S.W.3d at 705.

Husband contends that, despite the very low threshold applicable to modification of a residential parenting schedule, the trial court erred in finding a material change of circumstances took place after the entry of the original PPP. In support of his argument, Husband relies on statements in the trial court's oral ruling, which were later incorporated by reference into its final order related to its knowledge of Ms. McFadden's marijuana use at the time it entered the original PPP. In pertinent part, the trial court stated:

> The reality is that at the time this case was tried back in the spring, resulting in the Final Decree and existing Permanent Parenting Plan, an abundance of evidence was presented to the Court centered around, generally, the immoral behavior of the paramour, Ms. Elizabeth McFadden, that to include, among other things, her marijuana use.
>
> . . . .
>
> One might say that while discovery of a growing marijuana plant by deputies of the Shelby County Sheriff's Department is shocking to the conscience of some, quite frankly, in light of the proof presented during the trial of this case, it comes as no surprise to this Court.
>
> There was no evidence presented during this hearing that there was any real intent to sell and distribute this in support of the charges that were initially lodged, but absent that, in reality nothing has changed.
>
> The real change is that now Ms. McFadden has taken to growing her own marijuana in a container that apparently she has harvested for her personal use, and that is perhaps even more egregious than what we

21

encountered during the trial of the case.

> The quote, circumstances, end quote, which formed the basis upon which the existing Permanent Parenting Plan was predicated, in essence, remained the same. The restriction that was put in place at the time of the Final Decree and the entry of the existing Permanent Parenting Plan were deemed to be sufficient and, at the time, anticipated that they would abide future use.

> The real change of circumstances, if you will, after listening to the testimony presented, is that not only has that use not discontinued, it has grown, and I use that word somewhat loosely, realizing that we're dealing with a growing marijuana plant, rather than marijuana purchased from dealers.

> More compelling is listening to this father now testify, and the most compelling change of circumstance is that this parent has completely lost touch with reality. To now assert, and attempt to convince this Court, that this father had no knowledge of the ongoing use of marijuana by his house partner is, frankly, an insult to the conscience of this Court.

Husband emphasizes the trial court's statement that it had knowledge of Ms. McFadden's marijuana use when it entered the original PPP. Husband argues that the discovery that Ms. McFadden grew her own marijuana rather than purchased it is not a material change of circumstance. Perhaps more boldly, Husband contends that even if discovery of the marijuana plant is evidence of a material change in circumstance, it is evidence of a positive change because Ms. McFadden is no longer buying drugs from drug dealers.

We reject Husband's arguments. Given the "very low threshold" required to establish material change in circumstances in this case, we conclude that evidence does not preponderate against the trial court's finding that the discovery of the marijuana plant constitutes a material change of circumstances. Additionally, while Husband insisted in his testimony that the marijuana plant was solely Ms. McFadden's doing, his cavalier attitude towards her decision to engage in clearly illegal behavior is disconcerting. *See Armbrister*, 414 S.W.3d at 705 ("The character, attitude and general personality of other persons who would be in a position to influence the children are important considerations for the court."). Our review of Husband's testimony supports the trial court's finding that Husband "has completely lost touch with reality." Husband admitted that he knew Ms. McFadden was growing marijuana on the parties' property and that he never attempted to prevent or discourage her from doing so. Moreover, Husband admitted that the child, or

22

one of Ms. McFadden's children, could have accessed a box of "drug paraphernalia" discovered by the Sherriff's deputy in the parties' carport. Given the lower threshold applicable in modification proceedings, the proof in the record simply does not preponderate against the trial court's finding that Wife established a material change of circumstances.

Next, Husband contends that even if Wife did establish a material change in circumstances, the trial court erred in conditioning his parenting time on Ms. McFadden's compliance with the modified PPP. Specifically, Husband challenges the provision of the modified PPP that prohibits Husband from allowing Ms. McFadden to contact the child, and the provision that restricts his parenting time if Ms. McFadden does not agree to submit to three random drug tests per year until January 20, 2017. Husband argues that because Ms. McFadden is not a party to the proceedings, and the trial court had no jurisdiction to enjoin her from contacting the child or order her to submit to the drug tests, it erred in requiring her compliance as a condition of his parenting time. Wife, on the other hand, contends that the restrictions of the modified PPP are reasonable and cites cases in which this Court has held that it is proper to prohibit contact between a child and a third party.[9]

In our view, there is a clear distinction between prohibiting contact with a non-party and restricting a parent's contact based on a non-party's compliance with the PPP. The latter is not within the court's power. Though the case is not directly analogous, we find guidance from this Court's opinion in *Marlow v. Parkinson*, 236 S.W.3d 744 (Tenn. Ct. App. 2007). In *Marlow*, the trial court enjoined the father from allowing the stepmother to interfere with the mother's parenting obligations. *Id.* at 751. On appeal, this Court reversed, concluding that the terms of the injunction were overly broad. *Id.* at 752. The court stated that a better practice would have been to join the stepmother as a party and issue an injunction against her. *Id.* at 752 n.8. The *Marlow* Court noted that while many cases impose an obligation on a parent to police the activities of others while in the home where the child resides or in other locations when the parent is present with the children, the injunctions in those cases are tempered by the fact that the parent must have the ability to prevent the act that the trial court has prohibited. *Id.* at 752–53. The court stated that the injunction went well beyond the concept of controlling the environment to which the child was exposed. *Id.* at 753. Moreover, the court noted that there was no evidence in the record to indicate that the father had the authority or the ability to restrict the activities of his wife that occurred outside of his home or outside his or the child's presence. *Id.* Similarly, in the case before us, the trial court has essentially ordered Husband to police Ms. McFadden's activities and require her compliance with the PPP. There is no evidence in the record that Husband has the authority or the ability

---

[9]Wife cites *Mobley v. Mobley*, No. E2012-00390-COA-R3-CV, 2013 WL 1804189, at *14 (Tenn. Ct. App. Apr. 30, 2013), and *Stogner v. Stogner*, No. M2011-00503-COA-R3-CV, 2012 WL 1965598, at *3 (Tenn. Ct. App. May 31, 2012).

to prevent Ms. McFadden from contacting the child. Likewise, there is no evidence that Husband has the authority or ability to require Ms. McFadden to submit to the drug tests or to prevent her from engaging in activities outside of his presence that would cause her to fail the drug tests. The better practice would have been to join Ms. McFadden as a party and issue an injunction against her. *See id.* at 752 n.8. Thus, we conclude that the trial court erred in imposing restrictions on Husband that conditioned his parenting time on Ms. McFadden's actions. On remand, the trial court is instructed to modify the PPP so that Husband's parenting time is not conditioned on the actions of a non-party.

## C. Child Support

As part of its adoption of Wife's PPP, the trial court ordered Husband to pay child support in the amount of $1,421 per month. The trial court's calculation was based on a monthly gross income of $15,050.75 for Husband and $437 for Wife. Husband contends that the trial court erred in determining the amount of his child support obligation because the evidence preponderates against the trial court's findings as to each party's monthly income.

In setting the proper amount of child support, trial courts are guided by the Tennessee Child Support Guidelines ("Guidelines") promulgated by the Tennessee Department of Human Services. Tenn. Code Ann. § 36-5-101(e)(2); Tenn. Comp. R. & Regs. Ch. 1240-2-4-.01(1)(a). The Guidelines set forth the appropriate method for determining a parent's gross income. Tenn. Comp. R. & Regs. Ch. 1240-2-4-.04(3). "Gross income" is defined as "all income from any source" including salaries, bonuses, dividends, interest, annuities, and income from self-employment. *Id.* at 1240-2-4-.03(3)(a)(1). Variable income, such as a bonus, is to "be averaged over a reasonable period of time consistent with the circumstances of the case and added to a parent's fixed salary or wages to determine gross income." *Id.* at 1240-2-4-.04(3)(b). Imputing additional gross income to a parent is appropriate if the court finds that the parent is willfully and/or voluntarily underemployed. Tenn. Comp. R. & Regs. Ch. 1240-2-4-.04(3)(a)(2)(i)(I). A determination of willful and/or voluntary underemployment is not limited to choices motivated by an intent to avoid or reduce the parent's child support obligation. *Id.* at 1240-2-4-.04(3)(a)(2)(ii)(I). If the court makes such a determination, "additional income can be allocated to that parent to increase the parent's gross income to an amount which reflects the parent's income potential or earning capacity." *Id.* at 1240-2-4-.04(3)(a)(2)(ii)(II). Once the court has determined the appropriate income of the parties and the Guidelines have been applied, the calculation of child support is made with certainty, predictability, and precision. *Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005).

In its Findings of Fact and Conclusions of Law, the trial court noted that the

determination of each party's income was a threshold issue affecting its resolution of subsequent issues and expressed frustration with the evidence presented by each of the parties regarding income. The court noted that neither party presented a single pay stub or tax return and complained that "this record is simply devoid of any empirical evidence of the actual income of either one of these parties." Nevertheless, after reviewing the submissions and testimony of each party, the trial court adopted the figures in Wife's proposed PPP of monthly gross income of $15,050.75 for Husband and $437 for Wife.

We are sympathetic to the trial court's task of sorting through the parties' various submissions on income. In one part of Husband's Rule 14(C) affidavit, he listed his projected gross annual income for 2013 as $157,736 ($13,144.67 per month). Yet, in an estimated 2013 monthly budget included in the very same filing, Husband reported a gross income of only $8,343 per month.[10] Husband's 14(C) affidavit did not provide any income information for Wife. In his proposed PPP, Husband listed his gross income as $12,470 per month and imputed $3,500 of income per month to Wife. The income amounts listed in Wife's filings, while consistent with each other, were vastly different from those listed in Husband's filings. In both her 14(C) affidavit and proposed PPP, Wife listed Husband's gross income as $15,050 per month and listed her own income as $437 per month. Because the trial court adopted the income figures for each party submitted by Wife, we examine the method in which she calculated those figures.

### *Husband's Income*

For purposes of calculating Husband's monthly gross income, Wife imputed a base salary of $125,000 per year to Husband. She then calculated the average amount of Husband's annual bonuses from 2010-2012, which she determined to be $55,609.03. Wife added the two numbers together to arrive at her calculation of Husband's annual gross income of $180,609.03 or $15,050.75 per month. The trial court found Wife's determination of Husband's income to be accurate and adopted it in calculating Husband's child support obligation. Husband contends that the evidence preponderates against the trial court's finding.

We begin our analysis of Husband's income, perhaps inversely, by addressing the trial court's calculation and inclusion of Husband's annual bonuses. Husband contends that the trial court erred in including his bonuses in its calculation of his gross income because it had already allocated the use of Husband's annual bonus income to pay off his debt to Wife in the division of the marital estate. As stated above, the trial court ordered that Husband pay Wife the value of her interest in shares of LWM stock, with three percent interest annually, as alimony *in solido* over a period of years with payments

---

[10]This amount was apparently calculated based on a $100,000 base salary and did not account for income from Husband's annual bonus.

beginning at $15,000 per year and increasing by $2,000 per year until fully paid. In making its award, the trial court ordered that Husband's payments be made by January 31 of each year, which would coincide with Husband's receipt of his annual bonus. Therefore, Husband contends that the trial court's inclusion of his bonus income in calculating his gross income for child support means that the same income is allocated twice. We reject this argument for several reasons. First, the trial court's order does not specify that Husband must make his annual alimony *in solido* payments using income from his annual bonus; it merely points out that Husband will receive his bonus around the same time that the payments come due each year. Second, the average amount of Husband's annual bonuses ($55,609.03) is much larger than the amount of the alimony *in solido* payments due each January. Moreover, the Guidelines expressly state that bonus income is to be included in determining a parent's gross income. Tenn. Comp. R. & Regs. Ch. 1240-2-4-.04(3)(b). To determine Husband's annual bonus income, Wife averaged the bonus amounts listed in Husband's Personal Benefit Statements for 2010, 2011, and 2012. The statements reflect that Husband's bonus was $60,693.09 in 2010, $52,577 in 2011, and $53,557 in 2012. Using the three most recent years for which the amount Husband's bonus is available to calculate his average bonus income satisfies the Guidelines' direction to average variable income over a reasonable period. *See Stacey v. Stacey*, No. 02A01-9802-CV-00050, 1999 WL 1097975, at *4 (Tenn. Ct. App. Oct. 6, 1999) ("Since the amount of the option income varies from year to year, it would be fair to average the option income in 1996 and 1997 and add this figure to Husband's base salary."). Thus, we discern no error in the trial court's calculation and inclusion of Husband's bonus income in determining the amount of his gross income.

Husband also takes issue with the trial court's determination that his base salary is $125,000 per year. The amount of Husband's base salary was a point of discussion throughout the hearing and one that the court addressed specifically in its findings. On direct examination, Husband testified as follows regarding his salary in 2010 and 2011:

Q. Do you know what that is approximately in 2010?

A. In 2010, my gross salary would have been approximately a hundred or 110,000. And so my net pay would have been between six or $7,000.

Q. What, a month?

A. Yes, sir. And again, that's after payroll deductions and withholding.

Q. What about 2011?

A. 2011, my salary coming into that year was 110,000, from January

through March; it was approximately -- my annual income was 125,000.

And then effectively, post-leave-of-absence, my salary was 100,000 on an annual basis. And so our net income effectively for that period of time was, on an annual basis, again, between six and, you know, and about -- between six and $6500 a month.

Husband testified that the reduction in salary occurred as a result of his colleagues' discovery of his affair with Ms. McFadden:

Q. As a result of that, was any punitive action taken against you by Legacy?

A. Yes.

Q. What action was that?

A. It was a reduction in salary, which had just began in January 2011, from $125,000.00 to $100,000, and I was removed from the management committee. And I resigned as a voting member of the board of directors.

Citing its concerns with Husband's credibility, the trial court found that Husband's salary was never reduced and used his $125,000 base salary in its calculation of his gross income. The court stated:

The proof in this case is not even clear if [Husband's leave of absence] was to be with or without pay. Neither is the proof clear as to what period the sixty (60) day leave of absence covered. In that regard, the Court finds that there are many questions that surround the so-called "twenty-five thousand-dollar ($25,000) reduction" in base salary. For example, we do not know from this record when the reduction began. We do not know from this record if it was permanent or intended to be some temporary period. We do not know from this record that if it was intended to be a temporary period, from when to when, for example, that should cover. Moreover, indeed, from this record, the Court is not satisfied that this so-called "twenty-five thousand dollar ($25,000) reduction" even really occurred.

This Court must afford considerable deference to the trial court's factual findings where issues of witness credibility are concerned; however, we will re-evaluate the trial court's findings based on credibility if there is clear and convincing evidence to the contrary. *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014). For evidence to be clear and convincing, it must eliminate any and all "serious or substantial doubt about the

correctness of the conclusions drawn from the evidence." *Id.* at 692-93 (citations omitted). While that standard of review presents a high bar, our review of the record reveals that this case presents such a rare instance where the evidence is clearly and convincingly contrary to the trial court's findings.

To begin, we note that Wife's testimony corroborates Husband's claim that his salary was reduced. During questioning about Husband's affair with Ms. McFadden, Wife gave the following testimony:

Q. How did this impact Mr. Holdsworth's career?

A. It was pretty significant. When Legacy found out about the affair, they reduced his salary.

. . . .

Q. Now, as to your family, what happened to Mr. Holdsworth's -- Mr. Holdsworth was making how much per year as base salary at that point?

A. We were really excited. He had gotten a raise to a hundred and twenty-five thousand dollars a year.

Q. With that raise, when the affair was discovered, what happened to that?

A. They took twenty-five thousand dollars from that base salary. He was given a sixty-day leave of absence or suspension. He had to resign from the voting three board members at the company.

Additionally, the parties' testimony appears to be corroborated by the amount of Husband's base salary as it is listed in his Personal Benefit Statements from 2010, 2011, and 2012. The Personal Benefit Statements, which were offered as evidence of Husband's income *by Wife's attorney* on the first day of trial, list Husband's base salary as $110,000.43 in 2010, $110,416.65 in 2011, and $95,961.59 in 2012. While the trial court did not reference the Personal Benefit Statements in its Findings of Fact and Conclusions of Law, neither party has indicated that the income amounts listed in the statements are not accurate. In fact, we note that Wife calculated Husband's average annual bonus income using the bonus amounts listed in the very same statements. Adding Husband's base salary for each year to his annual bonus for that year, the Personal Benefit Statements reflect Husband's total pay as $170,693.52 in 2010, $162,993.65 in 2011, and $149,518.59 in 2012.[11] These amounts translate to gross

_____

[11]These amounts do not include employer contributions to Husband's 401(k) account of $1,099.90 in

28

monthly incomes of $14,224.46, $13,582.80, and $12,459.88 in each year respectively. These figures also align much more closely with the amount Husband listed in his proposed PPP as his 2012 gross income ($12,470 per month) than they do with the amount Wife listed in her filings and the trial court adopted ($15,050 per month).

Moreover, Wife never actually represented to the trial court that Husband's base salary was $125,000; rather, she argued that that Husband's *imputed* base salary was $125,000. A review of Wife's filings and arguments before the trial court reveals that she clearly sought to impute additional gross income to Husband under the theory that his reduction in salary, which resulted from his decision to conceal his relationship with Ms. McFadden, constitutes willful and voluntary underemployment. A footnote accompanying the $125,000 base salary amount, which Wife labeled "IMPUTED Base Salary," states:

> Father's base annual salary at Legacy Wealth Management was $125,000 prior to his resignation from his position as the third-highest-ranking employee, due to the willful and voluntary act of concealing his ongoing affair with [Ms. McFadden] during her hiring process at Legacy Wealth Management.

Additionally, in both his opening and closing statements to the trial court, Wife's attorney explicitly argued that Husband's reduction in salary was a result of willful and voluntary acts such that additional income should be imputed to him. Thus, Wife clearly acknowledged that Husband's actual base salary was less than $125,000 but urged the court to find that Husband was willfully and voluntarily underemployed and to impute additional income to him.

The Guidelines identify three situations in which imputing additional income to a parent is appropriate "[i]f a parent has been determined by a tribunal to be willfully and/or voluntarily underemployed or unemployed." Tenn. Comp. R. & Regs. Ch. 1240-2-4-.04(3)(a)(2)(i)(I). While trial courts have considerable discretion to determine whether to impute income to a parent for purposes of calculating child support, *Miller v. Welch*, 340 S.W.3d 708, 712 (Tenn. Ct. App. 2010), the Guidelines explicitly state that the court must make a determination that the parent is "willfully and/or voluntarily underemployed or unemployed" before it can impute income to the parent. Tenn. Comp. R. & Regs. Ch. 1240-2-4-.04(3)(a)(2)(i)(I). The trial court made no such finding in this case. The trial court simply refused to believe that any reduction in Husband's salary

---

2010 and $651 in 2011. The Guidelines specify that employee benefits that are typically added to the salary that a parent may receive as a standard added benefit, such as employer contributions to a retirement or pension plan, are not counted as income for purposes of calculating child support. Tenn. Comp. R. & Regs. Ch. 1240-2-4-.04(3)(a)(4)(iv).

ever occurred.

After reviewing the record, we conclude that the evidence preponderates against the trial court's finding that Husband earns a base salary of $125,000 per year. Because the trial court used that base salary in its calculation of Husband's annual gross income and child support obligation, the evidence also preponderates against the trial court's findings on those matters. Therefore, we vacate the trial court's determination of Husband's child support obligation and remand for a redetermination of his income and child support obligation.

### *Wife's Income*

The trial court also adopted Wife's calculation of her own monthly gross income. Wife set her own monthly income of $437 using her average monthly salary for the months she worked in 2012. After resigning from her position with Shelby County Schools in 2005, Wife did not return to the workforce until she began her private practice as a licensed clinical social worker in April 2012. In her proposed PPP, Wife reported that from April 2012 through December 2012 she earned $3,931. She calculated her monthly income as $437 by dividing that number by the number of months she worked that year (nine). The trial court found that Husband did not seriously challenge this amount and adopted it in calculating Husband's child support obligation. Husband contends that the evidence preponderates against the trial court's finding.

First, Husband argues that the trial court should have imputed gross income of $42,000 to $50,000 per year to Wife. Husband's argument is based in part on the fact that Wife's salary prior to resigning from Shelby County Schools in 2005 was approximately $42,000. Husband also relies on Wife's testimony that ideally, she would like to make between $40,000 and $50,000 in her private practice. The trial court rejected each of these arguments and stated that "Mr. Holdsworth offers no basis for such an imputation and the Court finds that such an imputation would be nothing more than mere speculation." We agree with the trial court's assessment. There is simply no evidence in the record to support such a finding.

Alternatively, Husband contends that because Wife failed to produce reliable evidence of her income, the trial court should have imputed annual gross income of $29,300 to Wife. The Guidelines provide that imputing income to a parent may be appropriate if the trial court has "no reliable evidence of the parent's income or income potential." Tenn. Comp. R. & Regs. Ch. 1240-2-4-.04(3)(a)(2)(iv)(I)II. The Guidelines state:

> I. If a parent fails to produce reliable evidence of income (such as tax returns for prior years, check stubs, or other information for determining

current ability to support or ability to support in prior years for calculating retroactive support); and

II. The tribunal has no reliable evidence of the parent's income or income potential;

III. Then, in such cases, gross income for the current and prior years shall be determined by imputing annual gross income . . . twenty-nine thousand three hundred dollars ($29,300) for female parents. These figures represent the full time, year round workers' median gross income, for the Tennessee population only, from the American Community Survey of 2006 from the U.S. Census Bureau.

Tenn. Comp. R. & Regs. Ch. 1240-2-4-.04(3)(a)(2)(iv)(I).

Here, there is no reliable evidence of Wife's income or income potential. The only specific evidence of the Wife's income before the trial court was Wife's own statements in her filings and testimony that she made $437 per month from April 2012 through December 2012. The trial in this case took place in April and May 2013. In its Findings of Fact and Conclusions of Law, the trial court implicitly found Wife's statement of her 2012 income to be credible. We have no reason to doubt its accuracy either. However, Wife is not an employee earning consistent pay. Wife is a licensed clinical social worker with a solo practice; she is a self-employed small business owner. As such, her income is bound to grow along with the growth and success of her business. Here, Wife provided only a snapshot of her income from the very earliest stages of her private practice. Given the unique circumstances of this case, we conclude that Wife's statement that she made $437 per month in 2012 is not reliable evidence of her income or income potential for purposes of calculating child support.

To begin, we note that the $437 per month figure is itself misleading. Wife started her own solo private practice from scratch in April 2012. While Wife undoubtedly had some contacts from her previous career in social work prior to 2005, such an endeavor will inevitably involve a period of client acquisition and added expenses as she establishes her practice. The only income information provided is from the very early stages of what Wife indicated that she planned to do "for the remainder of my life." Wife's statement that she made, on average, $437 per month during the first nine months of her private practice provides little, if any, insight into the amount of income she can be expected to make once her practice is more established. Moreover, Wife's own testimony indicates that she made more than $437 per month *in 2012* once she actually started seeing clients. Wife testified that after she received a letter reinstating her license on April 2, 2012, she had to wait "about a month" for her license to be approved and

mailed to her before she could begin to solicit clients. Wife did not meet with any clients in April 2012. Nevertheless, Wife included April in calculating her $437 as her average monthly income for 2012. Thus, it is clear that Wife actually made more than $437 per month in 2012 once she actually started soliciting and meeting with clients.

Additionally, the evidence indicates that the size of Wife's practice was growing each month. Wife testified that her practice was getting "steadily better" in 2013. She also testified that the months immediately preceding the trial were her busiest to date. Wife stated that in February 2013 she had eighty-two sessions with patients; in March 2013 she had sixty-five sessions despite taking two weeks off for spring break and for the initially scheduled trial dates; in April 2013 she had eighty-six sessions. Wife testified that May 2013, though the total number of sessions would likely be lower than April because of the time she took off for trial, was her busiest month to date. Wife indicated that she expected the trend to continue. When asked about her anticipated future earnings, Wife stated that she hoped to make $40,000 to $50,000 per year in her private practice, if not more.

In light of the foregoing, we conclude that the record does not include reliable evidence of Wife's income or income potential. We do not doubt the veracity of Wife's statement that she earned $437 per month from April 2012 through December 2012. However, given the circumstances, that statement does not accurately reflect Wife's income or her income potential. We conclude that the evidence preponderates against the trial court's use of $437 per month as Wife's income and remand this case for a determination of Wife's income potential in light of all relevant factors. If the parties are unable to provide reliable evidence of Wife's income on remand, the trial court should impute annual income of $29,300 according to the child support guidelines.

### Retroactive Child Support Award

During the pendency of the divorce proceedings, the trial court did not enter a temporary parenting plan setting child support.[12] Subsequently, as part of its adoption of Wife's PPP, the trial court ordered Husband to pay Wife $34,109.25 in retroactive child support that accrued since the parties' separation.[13]

---

[12]Wife submitted a Proposed Amended Temporary Parenting Plan on December 19, 2011 requesting that Husband make temporary child support payments of $1,602 per month. After a hearing, the trial court adopted Wife's plan on August 7, 2012. However, the plan adopted by the trial court did not include Wife's child support determination. Instead, the plan stated that "issues of current and retroactive child support are reserved for resolution by the Court at trial."

[13]The Guidelines provide that in divorce cases in which an initial child support award is being set, a judgment must generally be entered to include an amount of monthly support due from the date of the separation of the parties up to the date that an order for current support is entered. Tenn. Comp. R. & Regs. Ch. 1240-2-4-.06(1)(b)(1).

Husband argues that the trial court erred in failing to consider voluntary monthly payments of $1,000 he made to Wife during the pendency of the parties' divorce. During cross-examination, Husband stated that he paid Wife $1,000 per month beginning in October 2011:

> Q. Let me ask this: You only gave Ms. Holdsworth, your wife and the mother of your child, a thousand dollars a month, correct, since the separation?
>
> A. Correct, for 19 months, $19,000. And in addition to that over the period of time since I've filed, I have paid $47,000, approximately, in either marital expenses or direct reimbursements or expenditures on her behalf.
>
> Q. We'll look into some of those later on.
> But let me ask you this: You're saying that all of that's child support, yes?
>
> A. The $19,000, a thousand per month since October of '11 is child support, correct.

Though Wife acknowledged receiving those monthly payments during her own cross-examination, she did not necessarily agree that they were child support payments:

> Q. I believe Mr. Holdsworth started paying you with child support in the amount of $500 twice a month in October 2011; is that correct?
>
> A. He provided me -- yes, $500 twice a month. I'm not sure how it was deemed, but yes.

The trial court did not address its award of retroactive child support at all in its findings. The trial court's only statement in reference to the payments in its Findings of Fact and Conclusions of Law was made in the context of determining the appropriateness of Wife's alimony *in futuro* award:

> The Court further finds that since selling the parties' marital residence at a significant loss and moving out, the only *pendente lite* support given to the Wife by the Husband has been in an amount that is not even equal to the amount of child support that would be due based upon the child support guidelines.

Based on our review of the record, it is clear that the trial court did not consider

33

the payments at all in setting the amount of Husband's retroactive child support obligation. In his brief, Husband cited a similar case, *Gilland v. Gilland*, Nos. M2002-02276-COA-R3-CV, M2002-02770-COA-R3-JV, 2004 WL 2583885 (Tenn. Ct. App. Nov. 9, 2004). In *Gilland*, the lower court awarded the mother $23,273.50 in retroactive child support. *Id.* at *7. The father asserted that he voluntarily paid $27,270 in support of the parties' child prior to entry of the court's order. *Id.* The mother admitted she received $25,000 from the husband prior to entry of the order but argued that the funds were for payment of another debt and were not child support. *Id.* The lower court ruled in the mother's favor. *Id.* In reversing the lower court's ruling, this Court stated:

> Based on our de novo review of the evidence, we find that the evidence preponderates against the court's ruling. Father testified that he paid Mother specific amounts of money for a period of time following the child's birth. Mother did not deny receiving the money; to the contrary, she essentially admitted receiving the money. Mother's challenge to the payments by Father arises from and pertains to their dispute regarding the $25,000 she deposited into his account following the sale of her house. She claims Father has not repaid the $25,000 he allegedly owes her. She may be right; however, we are not ruling on whether Father owes her $25,000 from the sale of her house. He testified that he paid her amounts in excess of the arrearage judgment following the child's birth as support for the child. She does not deny receiving the funds, she only challenges the reason for its payment. Considering all of the evidence before us we find that the evidence preponderates in favor of the finding that Father remitted funds as support in excess of the arrearage judgment and therefore is entitled to credit for the payments.

*Id.* This Court ruled that the father was entitled to a credit in an amount not to exceed the amount of the retroactive child support award set by the lower court.[14] *Id.* at *8.

Wife contends that *Gilland* is distinguishable because the parties in that case were never married and there were no temporary alimony issues to consider in that case. Based on our review of the record, however, there are no temporary alimony issues to consider in this case either. The trial court never entered an order requiring Husband to make regular payments of *pendente lite* support or temporary spousal support to Wife. Wife does not dispute she received the monthly payments, nor does she dispute that Husband made the payments voluntarily. Wife received the payments; Wife was the child's primary residential parent; we fail to see any distinction between Husband's voluntary monthly payments and monthly payments Wife would have received had a

---

[14]The Court stated that any amounts the father paid in excess of the amount of the retroactive support award should be viewed as gratuity or voluntary contributions. *Gilland*, 2004 WL 2583885, at *8.

temporary child support order been in place.

Having considered all of the evidence, we conclude that Husband is entitled to credit for the monthly payments to the extent that the total amount of the credit does not exceed the amount of the retroactive child support obligation. Additionally, we note that the calculation of Husband's retroactive child support obligation was based on the same inaccurate income figures discussed in further detail in the previous sections. Thus, we vacate the trial court's award of $34,109.25 in retroactive child support and direct the trial court on remand to recalculate the amount of the award in light of its findings as to the parties' incomes and consistent with this opinion.

## D. Alimony

Husband contends that the trial court erred in making its awards of alimony *in futuro* and *in solido*. As previously noted, the trial court awarded Wife $4,000 per month in alimony *in futuro* and $461,586.82 in attorney's fees and expenses as alimony *in solido*.

The Tennessee Supreme Court recently discussed the standard of review applicable to a trial court's decision on matters of alimony in detail in *Gonsewski v. Gonsewski*:

> For well over a century, Tennessee law has recognized that trial courts should be accorded wide discretion in determining matters of spousal support. *See Robinson v. Robinson*, 26 Tenn. (7 Hum.) 440, 443 (1846) ("Upon a divorce . . . the wife is entitled to a fair portion of her husband's estate for her support, and the amount thus to be appropriated is a matter within the legal discretion of the chancellor. . . ."). This well-established principle still holds true today, with this Court repeatedly and recently observing that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award. *See, e.g.*, *Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004); *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001); *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000).

> Equally well-established is the proposition that a trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. *Kinard v. Kinard*, 986 S.W.2d 220, 235 (Tenn. Ct. App. 1998); *see also Burlew*, 40 S.W.3d at 470; *Robertson v. Robertson*, 76 S.W.3d 337, 340-41 (Tenn. 2002). As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal

support decision." *Kinard*, 986 S.W.2d at 234. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. *Robertson*, 76 S.W.3d at 343. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision. *Wright*, 337 S.W.3d at 176; *Henderson*, 318 S.W.3d at 335.

*Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105-06 (Tenn. 2011)(footnote omitted).

Tennessee law recognizes four distinct types of spousal support: (1) alimony *in futuro*, (2) alimony *in solido*, (3) rehabilitative alimony, and (4) transitional alimony. Tenn. Code Ann. § 36-5-121(d)(1). In *Mayfield v. Mayfield*, the supreme court offered a description of each form of spousal support:

Alimony *in futuro,* a form of long-term support, is appropriate when the economically disadvantaged spouse cannot achieve self-sufficiency and economic rehabilitation is not feasible. Alimony *in solido,* another form of long-term support, is typically awarded to adjust the distribution of the marital estate and, as such, is generally not modifiable and does not terminate upon death or remarriage. By contrast, rehabilitative alimony is short-term support that enables a disadvantaged spouse to obtain education or training and become self-reliant following a divorce.

Where economic rehabilitation is unnecessary, transitional alimony

may be awarded. Transitional alimony assists the disadvantaged spouse
with the "transition to the status of a single person."

*Mayfield,* 395 S.W.3d 108, 115 (Tenn. 2012) (internal citations omitted).

While courts are afforded considerable discretion in matters of spousal support,
they must make their determination within the statutory framework. The Tennessee
statutes concerning spousal support reflect a legislative preference favoring short-term
spousal support over long-term spousal support, with the aim being rehabilitation of the
economically disadvantaged spouse relative to the other spouse and to achieve self-
sufficiency where possible. *See* Tenn. Code Ann. § 36-5-121(d)(2)-(3); *Gonsewski*, 350
S.W.3d at 109. "While this statutory preference does not entirely displace long-term
spousal support, alimony in futuro should be awarded only when the court finds that
economic rehabilitation is not feasible and long-term support is necessary." *Gonsewski*,
350 S.W.3d at 109 (citing *Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004);
*Robertson v. Robertson*, 76 S.W.3d 337, 341-42 (Tenn. 2002)). Thus, trial courts should
not refrain from awarding long-term support when such support is appropriate under the
statutory factors. *Robertson*, 76 S.W.3d at 341-42.

In determining whether to award spousal support and, if so, the nature, amount,
length, and manner of payment, courts must consider all relevant factors, including, to the
extent that they are relevant, the statutory factors listed in Tennessee Code Annotated
section 36-5-121(i).[15] Although the court must consider each of the relevant statutory

---

[15]The statutory factors include:

> (1) The relative earning capacity, obligations, needs, and financial resources of
> each party, including income from pension, profit sharing or retirement plans and all
> other sources;
> (2) The relative education and training of each party, the ability and opportunity
> of each party to secure such education and training, and the necessity of a party to secure
> further education and training to improve such party's earnings capacity to a reasonable
> level;
> (3) The duration of the marriage;
> (4) The age and mental condition of each party;
> (5) The physical condition of each party, including, but not limited to, physical
> disability or incapacity due to a chronic debilitating disease;
> (6) The extent to which it would be undesirable for a party to seek employment
> outside the home, because such party will be custodian of a minor child of the marriage;
> (7) The separate assets of each party, both real and personal, tangible and
> intangible;
> (8) The provisions made with regard to the marital property, as defined in § 36-4-
> 121;
> (9) The standard of living of the parties established during the marriage;
> (10) The extent to which each party has made such tangible and intangible

37

factors relevant to the parties' circumstances, "the two that are considered the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay." *Gonsewski*, 350 S.W.3d at 110 (citations omitted). Guided by these principles, we consider the trial court's awards of spousal support and the specific circumstances of this case.

### *Alimony in Futuro*

The trial court awarded Wife alimony *in futuro* of $4.000 per month until her death or remarriage. Husband contends that the trial court's award is excessive and unwarranted in this case. In arguing that the trial court erred in granting Wife alimony *in futuro*, Husband relies heavily on the supreme court's opinion in *Gonsewski* for support.

The parties in *Gonsewski* were married for twenty-one years and had two adult children. *Gonsewski*, 350 S.W.3d at 103. In the year preceding their divorce, the wife earned $73,000, and the husband earned approximately $170,000. *Id.* The trial court determined that the wife was not entitled to alimony of any kind given her stable job, good income, and share of the marital estate. *Id.* at 104. The court of appeals reversed the trial court's decision and ordered the husband to pay alimony *in futuro* of $1,250 per month. *Id.* The supreme court reversed the court of appeals and explained that alimony *in futuro* should not have been awarded because it is intended to apply when the recipient party could not be fully rehabilitated. *Id.* at 111. The supreme court also emphasized that an appellate court is not permitted to substitute its judgment for that of the trial court and should not reverse a trial court's alimony decision unless it has abused its discretion. *Id.* at 112.

We disagree with Husband's contention that *Gonsewski* is analogous to the present case. In *Gonsewski*, the appellate court was charged with considering whether the trial court abused its discretion in *declining* to award alimony; in this case, we review the trial court's decision to *grant* Wife alimony *in futuro*. Because we are reviewing a trial court's decision to award alimony rather than deny it, *Gonsewski* is only marginally useful on this issue.

---

contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i).

As we stated above, alimony *in futuro* is appropriate when the economically disadvantaged spouse cannot achieve self-sufficiency and economic rehabilitation is not feasible. Tenn. Code Ann. § 36-5-121(f)(1). Though the general assembly has expressed a preference for awards of short-term alimony, it has not entirely displaced awards of long-term spousal support like alimony *in futuro*. Before a trial court can make an award of alimony *in futuro*, however, it must make a finding that "economic rehabilitation is not feasible and long-term support is necessary." *Gonsewski*, 350 S.W.3d at 109 (citing *Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004); *Robertson v. Robertson*, 76 S.W.3d 337, 341-42 (Tenn. 2002)).

In this case, the trial court stated that, "the Wife is not a candidate for either transitional alimony or rehabilitative alimony as those forms are described and defined in the Tennessee Code." However the trial court did not make any specific factual findings to support its conclusion that Wife was not capable of rehabilitation. When the trial court has not made a specific finding on a particular issue, this Court reviews the record to determine where the preponderance of the evidence lies. *Lee v. Lee*, 66 S.W.3d 837, 843 (Tenn. Ct. App. 2001).

For purposes of determining whether an award of alimony *in futuro* is appropriate, rehabilitation means that:

> the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse.

Tenn. Code Ann. § 36-5-121(f)(1); *Gonsewski*, 350 S.W.3d at 111. Alimony *in futuro* "is not, however, a guarantee that the recipient spouse will forever be able to enjoy a lifestyle equal to that of the obligor spouse." *Gonsewski*, 350 S.W.3d at 108 (quoting *Riggs v. Riggs*, 250 S.W.3d 453, 456 n. 2 (Tenn.Ct.App.2007)). In many instances, the economic realities of divorce are such that "in most divorce cases it is unlikely that both parties will be able to maintain their pre-divorce lifestyle." *Id.* (quoting *Kinard v. Kinard,* 986 S.W.2d 220, 235 (Tenn.Ct.App.1998)). Thus, the prior concept of alimony as lifelong support to enable the disadvantaged spouse to maintain the marital standard of living has been superseded by the statutory preference for short-term support. *See id.* (quoting *Robertson v. Robertson,* 76 S.W.3d 337, 340–41 (Tenn.2002)).

This Court recently addressed a similar situation in *Willenberg v. Willenberg*. No. M2013-02627-COA-R3-CV, 2014 WL 4725252 (Tenn. Ct. App. Sept. 23, 2014), which we find to be instructive in our disposition of the present case. In *Willenberg*, the parties

were married for twenty-three years. *Id.* at *2. The husband earned between $100,000 and $120,000 per year, with the ability to increase his earning capacity. *Id.* The wife had a degree in public management, had experience as a probation officer, and had no physical limitations. *Id.* at *4. She earned $39,000 per year but could increase her salary to about $50,000 per year with her completion of a two-year accounting program. *Id.* The trial court awarded wife alimony *in futuro* of $2,000. *Id.* at *3. On appeal, this Court determined that the trial court did not make specific findings relative to its conclusion that the wife was not capable of rehabilitation and conducted its own review of the record to determine whether the preponderance of the evidence supported the trial court's award. *Id.* This Court ruled that the evidence supported a determination that the wife was capable of rehabilitation and reversed the trial court's award of alimony *in futuro* and awarded the wife rehabilitative alimony. *Id.*

Turning our attention back to the case at bar, we conclude that the preponderance of the evidence supports a determination that Wife is capable of rehabilitation. Wife's earning capacity and financial situation is remarkably similar to the wife in *Willenberg*. Wife is relatively young; at the time of trial, she was forty-three years old. She testified that she did not have any medical conditions that impaired her ability to work. Wife also has a Master's Degree in Science and Social Work. As the trial court noted, she is "exceedingly well educated." Though she had been out of the workforce for approximately seven years prior to starting her private practice as a licensed clinical social worker, she has experience in the field. While Wife is still in the process of establishing her private practice, the evidence indicates that she will be able to utilize her education and experience to earn a good income. Wife testified that "[s]tarting out, I think I'm doing pretty well," and that business was "steadily getting better." She stated that she expected to eventually make $40,000 to $50,000 per year in private practice if not more. Indeed, Wife testified that she chose to enter private practice because she wanted to find "a position I could do for the remainder of my life that would eventually provide the most income." This testimony supports a determination that Wife can be rehabilitated to achieve a high income in the future and that long-term support as ordered by the trial court is not necessary. We reverse the trial court's award of alimony *in futuro*.

Notwithstanding our determination that long-term support is not necessary in this case, we are mindful of Wife's need for support during this period of transition from married life to single life as she establishes her private practice. "Transitional alimony is designed to aid a spouse who already possesses the capacity for self-sufficiency but needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income." *Gonsewski*, 350 S.W.3d at 109. The trial court found that Wife demonstrated a monthly need for

$4,000 per month in support.[16] Wife stated that she anticipated making $40,000 to $50,000 per year in her private practice but estimated that it would take about five years of gradually growing her clientele to reach that goal. Thus, while it is clear that Wife is not currently capable of self-sufficiency, the evidence indicates that she has the capacity to become self-sufficient over time as her income from private practice increases. Therefore, we conclude that Wife is a candidate for transitional alimony. Accordingly, we direct the trial court on remand to determine the appropriate duration and amount of Wife's transitional alimony award, bearing in mind that Wife testified that it would take about five years to grow her clientele.

### *Attorney's Fees*

Finally, we consider the trial court's awards of attorney's fees. In its Final Decree of Divorce, the trial court awarded Wife $461,586.82 in attorney's fees and expenses as alimony *in solido*. Later, the trial court awarded Wife an additional $9,528 in attorney's fees and expenses associated with litigation of her petition to modify the PPP. Husband challenges the award of fees and expenses, arguing that it is extreme and unnecessary. Wife responds that Husband has the ability to pay for the fees and that if she is forced to pay them she will be forced to deplete her share of the marital estate.

The trial court's Findings of Fact and Conclusions of Law, in which it awarded the initial $461,586.82 in attorney's fees, provide:

> 130. It is, of course, the Wife's theory and contention that the Husband should be responsible for all of her litigation expenses, including attorney's fees, court reporters, and so on. In that regard, the Court makes the following findings:

> 131. From the outset, this litigation has been entirely of the Husband's making. From the time the dark side of his life with Elizabeth McFadden came to light, he has been dead set on abandoning what, by all accounts, was a good and solid marriage with his present wife and the mother of his child.

---

[16]The trial court's finding was based on the figures submitted in Wife's Rule 14(C) affidavit. In the affidavit, Wife claimed she had a monthly shortfall of $6,773; however, the trial court found that this amount erroneously included certain expenses. Therefore, the trial court excluded $3,365 of Wife's claimed expenses from its calculation. We note that reducing the amount of Wife's claimed monthly shortfall ($6,773) by the amount of the expenses the trial court excluded in its calculation ($3,365) results in a shortfall of $3,408. However, as Husband has not raised this issue in his brief, we decline to address it.

41

132. In spite of it all, it is clear to the Court from the proof and from the pleadings that the Wife did not necessarily want to even be divorced. Indeed, given her professional background, training, experience, and her practice, the Court is of the distinct impression that she has much preferred to attempt to seek a reconciliation and make this marriage work.

133. According to the Wife's testimony, the Husband informed her that <u>he wanted a divorce</u>. The record is not completely clear about how much time passed from the point of his telling his wife that he wanted a divorce. It appears to be about a month. Mr. Holdsworth grew impatient. When Mrs. Holdsworth did not file, he filed the original complaint in this cause. Mrs. Holdsworth was left with no choice but to defend herself and take all reasonable steps necessary to protect her own rights and those of the parties' daughter [].

134. At the outset, the Court articulated certain facts that could be gleaned from the docket entries in this case. A printout of the docket entries in this case consists of some nineteen (19) pages of entries.… A careful review of the docket in this case reveals how Steven Holdsworth has thrown up smoke screen after smoke screen after smoke screen and roadblock after roadblock after roadblock, and that's especially so in the discovery process alone.

135. Among the exhibits in the case is Trial Exhibit No. 613 which contains a somewhat detailed summary of the litigation history more than I have just articulated. As a result, the Wife in this case has been forced to incur attorney's fees and other litigation expenses in the hundreds of thousands of dollars. Fortunately for her, she has been able to turn to her parents for help, and they have been able to respond. Our law clearly allows for reimbursement of such litigation expenses from one spouse to the other in appropriate and proper cases. This is one such case.…

136. The Court is compelled to a conclusion here that the Wife is entitled to recover all of such expenses from the Husband. In the case of *Aaron v. Aaron*, 909 S.W.2d 408 (Tenn. 1995) we are taught by our appellate courts that the analysis must follow the same analysis as for alimony.

137. Found among the exhibits in this case are Exhibit No. 61, which is a collection of promissory notes numbered one (1) through twelve (12); also, Exhibit No. 152, which is an affidavit of attorney's fees and

expenses; and Exhibit No. 613, which is an amended affidavit of attorney's fees and expenses.…

138.    The Court has reviewed the itemization of fees and expenses and finds all to be necessarily incurred and reasonable and in line with charges made by other attorneys practicing in the field of domestic relations law in this community.  Moreover, the Court has considered the factors again set forth in T.C.A. § 36-5-121(i).  The Court will order and direct that the Wife be awarded her attorney's fees and other suit expenses as alimony *in solido*, necessary for her support. . . .

In a divorce proceeding, an award of attorney's fees may constitute alimony *in solido*.  *See* Tenn. Code Ann. § 36-5-121(h)(1) ("alimony in solido may include attorney fees, where appropriate"); *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 113 (Tenn.2011).  The decision whether to award attorney's fees as alimony *in solido* is within the sound discretion of the trial court, and that decision will only be overturned if the trial court abuses that discretion.  *Gonsewski*, 350 S.W.3d at 113 (citations omitted).  "An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski*, 350 S.W.3d at 105.  As with any alimony award, the trial court making an award of attorney's fees as alimony *in solido* should consider the factors enumerated in Tennessee Code Annotated section 36-5-121(i).  *Id.*  Generally, an award of attorney's fees is appropriate if the spouse receiving the award demonstrates that he or she "is financially unable to procure counsel, and where the other spouse has the ability to pay." *Id.* at 113.  We address each of these factors separately.

First, Wife did not demonstrate that she was financially unable to procure counsel, and the trial court did not make a factual finding that she was unable to do so.  Thus, she fails to meet the first prong of the analysis.  The trial court did note the existence of several promissory notes indicating that Wife borrowed funds from her parents between February 23, 2011 and April 25, 2013.  Attachments to the promissory notes indicate that Wife's parents funded everything associated with Wife's life during this particular period, including payment for Wife's attorney's fees, Wife's purchase of professional clothing, and even the euthanasia of a pet.  Further, it appears that Wife's mother provided a listing of expenses to Wife's counsel, who appears to have then drafted the promissory notes ultimately signed by Wife. The promissory notes bear interest at the rate of one percent (1%) per year, contain no payment schedule, and indicate only that they are demand notes.

The trial court noted that Wife was able to turn to her parents for help, and the

existence of the promissory notes discussed above certainly supports that conclusion. While the Tennessee Supreme Court's choice of wording in *Gonsewski* is our most recent guide on this issue, the court's choice of wording in a prior decision is also worthy of note. In *Fox v. Fox*, 657 S.W.2d 747 (Tenn. 1983), the Tennessee Supreme Court, in discussing a wife's right to an allowance of legal expenses, noted:

> [i]t is conditioned upon a lack of resources to prosecute or defend a suit in good faith. This rule is to enable the wife, when destitute of means of her own, to obtain justice and to prevent its denial. *Thompson v. Thompson*, 40 Tenn. 527, 529 (1859). If a spouse does not have separate property of her own which is adequate to defray the expenses of suit, certainly she should not be denied access to the courts because she is unable to procure counsel.

*Id*. at 749. Clearly, Wife had resources upon which to draw to participate in this litigation, and she was not destitute. Not only did her parents aid her, but she was also awarded over $400,000 in marital assets and had returned to the workforce. However, in finding that Wife was entitled to recover attorney's fees from Husband, the trial court did not analyze Wife's share of the marital estate or her income.

Moreover, the test articulated by the *Gonsewski* court does not require a party to prove that he or she is financially unable to procure the most experienced or most expensive attorney in the region. Wife had the freedom to choose which counsel she would hire, and she must bear some responsibility for her choice. Wife must also bear some responsibility for her choice of litigation strategy. Litigants are not flies on the wall observing the litigation in which they are embroiled; they maintain some measure of control over the lengths to which their attorneys reach, and they must bear some responsibility for it as well. While Wife's counsel has clearly used "every litigation arrow in his quiver in pursuit of [Wife's] goals," and while she can "certainly engage in such a strategy[,] she must recognize that she cannot expect the other side to pay for it." *Coleman v. Coleman*, No. W2011-00585-COA-R3-0CV, 2015 WL 479830 (Tenn. Ct. App. 2015) (*no perm. app. filed*) (quoting the trial judge's concerns with attorney's fees).

On appeal, Wife argues that she will be required to deplete her share of the marital estate if she is required to pay her own fees. The primary asset of this marriage was the LWM stock, which was valued by Husband at $468,599 and valued by Wife at $839,261. The trial court accepted Wife's valuation and split it, awarding each party $419,631. Wife's attorney's fees exceed her share of the marital estate by more than $50,000. Wife's argument regarding depletion of her share of the marital estate fails to acknowledge that requiring Husband to pay her attorney's fees would have the effect of requiring Husband to deplete *his* share of the marital estate. This scenario seems to be a textbook case of "having your cake and eating it too." Wife wants to preserve *her* share

of the marital estate yet ensure that Husband is depleted of *his* share of the marital estate, based on *her* choice of attorneys and litigation strategy. Such a result is illogical, given that the trial court conducted no analysis on Husband's ability to pay.

With regard to the second consideration, the trial court did not make an express finding that Husband had the ability to pay the attorney's fees in light of the other financial obligations he must bear. The trial court did not analyze the financial impact of the division of the marital estate, child support, and alimony on Husband before also requiring him to pay nearly half of a million dollars in Wife's attorney's fees.

In *Anderton v. Anderton*, 988 S.W.2d 675, 679-80 (Tenn. Ct. App. 1998), this court stated:

> The dissolution of a marriage requires the courts to engage in the orderly disentanglement of the parties' personal and financial affairs. Many of the issues that must be addressed during this process are interrelated, and the disposition of earlier issues directly influence the decision on later issues. Accordingly, the parties and the courts should pay careful attention to the order in which the various issues in a divorce case are addressed and decided.
>
> . . . .
>
> The trial court's first task . . . is to identify and distribute the parties' separate property and then divide their marital property in an equitable manner. . . . Sorting out the parties' property interests must precede support decisions because the manner in which the separate and marital property is divided can affect later support decisions.
>
> After the parties' property interests have been addressed, trial courts should then turn their attention to child support. . . . Child support decisions should precede decisions about spousal support because a spouse's ability to pay spousal support may be directly and significantly influenced by the amount of child support he or she has been ordered to pay.
>
> Consideration of spousal support questions should follow the disposition of all the preceding questions.

*Anderton*, 988 S.W.2d at 679 (citations and footnotes omitted). With respect to both child support and alimony, the trial court must determine whether the obligor spouse has an ability to pay. In making an alimony award, the trial court must analyze ability to pay

by including the obligor spouse's child support payment. In the category of alimony, the trial court should first make a determination regarding alimony that is intended to help support or rehabilitate the disadvantaged spouse, regardless of type, before making a determination regarding attorney's fees as alimony *in solido*. Thus, "ability to pay" must be analyzed three separate times: when determining the amount of child support; when determining the amount of supportive alimony; and when determining the amount of attorney's fees as alimony *in solido*. This three-step analysis is necessary because each additional obligation imposed impacts the obligor's ability to pay the next award. *See, e.g., Douglas v. Douglas*, No. M2008-00219-COA-R3-CV, 2009 WL 21036, at *6 (Tenn. Ct. App. Jan. 2, 2009) (reducing an award of attorney's fees as alimony *in solido*, even where the wife was significantly disadvantaged economically, because Husband had "numerous obligations to pay," including child support and transitional alimony, which impaired "his ability to pay additional alimony in the form of Wife's attorney's fees"). Thus, in this case, the trial court erred by not expressly considering Husband's income and share of the marital estate, his living expenses, his own attorney's fees, his child support obligation, and his spousal support payment before determining whether he had an ability to pay Wife's attorney's fees as alimony *in solido*. Considering all these factors, Husband simply does not have the ability to pay Wife's exorbitant attorney's fees. Thus, we reverse the trial court's award of Wife's attorney's fees and expenses.

We would be remiss if we did not convey our displeasure with the extraordinary amount of attorney's fees incurred in this case. Though Husband initially tried to conceal the extent of his relationship with Ms. McFadden, he admitted fairly early on in this litigation that he had engaged in an extra-marital affair constituting inappropriate marital conduct. The parties agreed that Wife should be designated primary residential parent of their child and submitted substantially similar proposed PPPs to the trial court. Additionally, despite Husband's professional success and high income, the parties' only substantial asset at the time of the divorce was the LWM stock, which they agreed should be divided equally between them. Nevertheless, the parties somehow incurred more than half of a million dollars in attorneys' fees and expenses. The trial judge stated that this case "could arguably be the most 'litigated' case" he had been involved in during the course of his more than forty years in the legal profession, and we are perplexed by the fact that Wife's attorney's fees well exceed her share of the marital estate. We note that our disposition of issues on appeal may necessitate further proceedings in the trial court for which each party may incur additional attorneys' fees and expenses. Given the extraordinary amount of attorneys' fees and expenses already incurred by the parties in what should have been a relatively straightforward case, we strongly encourage the parties and their attorneys to dispose of the remaining issues as efficiently as possible on remand.

Both parties contend that they should be entitled to an award of attorney's fees and expenses associated with this appeal. Considering the result reached in this appeal, we decline to make such an award.

## IV. CONCLUSION

Based on the foregoing, the judgment of the trial court is affirmed in part, affirmed in part as modified, vacated in part, reversed in part, and remanded for further proceedings consistent with this opinion. Costs of this appeal taxed one-half to the appellee, Wendy Alford Holdsworth and one-half to the appellant, Steven A. Holdsworth, and his surety, for which execution may issue, if necessary.


_____

BRANDON O. GIBSON, JUDGE